United States District Court
Southern District of Texas
**ENTERED**
June 03, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GERALD CALDWELL,                    §
                                    §
            Plaintiff,              §
                                    §
v.                                  §     CIVIL ACTION NO. H-15-0308
                                    §
KHOU-TV and GANNETT CO., INC.,      §
                                    §
            Defendants.             §

## MEMORANDUM OPINION AND ORDER

Plaintiff, Gerald Caldwell, brings this action against defendants, KHOU-TV ("KHOU") and Gannett Co., Inc. ("Gannett"), for employment discrimination based on disability in violation of Title I of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12111, et seq. ("ADA"), and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq. Pending before the court is Defendants' Motion for Summary Judgment (Docket Entry No. 27). For the reasons set forth below, Defendants' Motion for Summary Judgment will be granted, and this action will be dismissed.

## I.  Standard of Review

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact, and the law entitles it to judgment. Fed. R. Civ. P. 56(c). Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

<u>Anderson v. Liberty Lobby, Inc.</u>, 106 S. Ct. 2505, 2511 (1986).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp. v. Catrett</u>, 106 S. Ct. 2548, 2552 (1986).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not <u>negate</u> the elements of the nonmovant's case."  <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (<u>en banc</u>)(quoting <u>Celotex</u>, 106 S. Ct. at 2553-2554).  "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."  <u>Id.</u>  If, however, the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by admissible evidence that specific facts exist over which there is a genuine issue for trial.  <u>Id.</u>  In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 120 S. Ct. 2097, 2110 (2000).  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  <u>Little</u>, 37 F.3d at 1075.

-2-

## II. Undisputed Facts

KHOU initially hired plaintiff as a video editor in 1995.[1] When KHOU initially hired plaintiff, he already had a visible disability caused by bone cancer suffered as a child.[2] The job of video editor involves two different functions: cutting film and working in electronic digital recording ("EDR").[3] When plaintiff was initially hired in 1995, he spent approximately 20 percent of his time in EDR, but today he spends up to 90 percent of his time in EDR and only 10 percent of his time on traditional video editing.[4] Plaintiff's performance reviews show that although his supervisors believed that his medical issues limited his ability to perform EDR duties, he could be called upon to complete EDR tasks when needed, he stayed current on changes in the EDR systems, and he adapted well when new EDR systems were introduced at KHOU.[5]

---

[1] Oral Deposition of Gerald Caldwell ("Plaintiff's Deposition"), p. 104:24-25, Exhibit A to Defendants' Motion for Summary Judgment ("Defendants' MSJ"), Docket Entry No. 27-1, p. 34.

[2] Id. at 41:22-42:3, and 110:14-16; Exhibit A to Defendants' MSJ, Docket Entry No. 27-1, pp. 11-12, and 37.

[3] Oral Deposition of Robert James Kell ("Kell Deposition"), p. 8:4-12, Exhibit C to Defendants' MSJ, Docket Entry No. 27-3, p. 3.

[4] Plaintiff's Deposition, pp. 36:4-18; 55:10-20; 104:16-105:8, Exhibit A to Defendants' MSJ, Docket Entry No. 27-1, pp. 7, 19, 34-35.

[5] Performance Reviews, Exhibit I to Caldwell's Response to Defendants' Motion for Summary Judgment ("Plaintiff's Response"), Docket Entry No. 30-9, p. 2 (period ending 08/01/2011), p. 5 (period ending 08/03/05), pp. 12-13 (period ending 10/09/01); p. 15 (period ending 07/31/08).

Nevertheless, in 2008 after his leg was put in a brace, plaintiff's immediate supervisor, Charles Butera, stopped scheduling plaintiff for EDR duties because of fear that plaintiff would be injured in the tight EDR work space.[6]

In 2012 Butera left KHOU and was replaced by Robert James Kell who maintained Butera's practice of not scheduling plaintiff to work in EDR.[7]

In December of 2013 KHOU was acquired by Gannett.[8]

In 2014 plaintiff required surgery related to his disability. In March plaintiff took a few days of personal time for a pre-surgical procedure.[9]  Plaintiff had taken medical leave numerous times before and knew he needed to notify his supervisor, Kell, and the HR representative, Shannon Hunter, before doing so.[10]

In the spring of 2014 Gannett mandated a reduction-in-force ("RIF") at KHOU,[11] pursuant to which KHOU was to eliminate two of

---

[6]Oral Deposition of Charles Butera, Jr. ("Butera Deposition"), pp. 15:13-18:17, 24:13-25:7, Exhibit C to Plaintiff's Response, Docket Entry No. 30-3, pp. 5-8, 11-12.

[7]Id. at 6:1-3, Exhibit C to Plaintiff's Response, Docket Entry No. 30-3, p. 3.  See also Kell Deposition, pp. 24:6-26:16, Exhibit E to Plaintiff's Response, Docket Entry No. 30-5, pp. 8-10.

[8]Oral Deposition of Shannon Hunter, p. 62:8-10, Exhibit D to Plaintiff's Response, Docket Entry No. 30-4, p. 12.

[9]Plaintiff's Deposition, p. 43:13-23, Exhibit A to Defendants' MSJ, Docket Entry No. 27-1, p. 13.

[10]Id. at 40:5-21, Exhibit A to Defendants' MSJ, Docket Entry No. 27-1, p. 10.

[11]Oral Deposition of Philip Allan Bruce ("Bruce Deposition"), pp. 15:23-16:21, Exhibit B to Defendants' MSJ, Docket Entry No. 27-2, pp. 4-5.

eight video editor positions.[12]  The ultimate decision of which positions to eliminate was made by KHOU's News Director, Philip Allan Bruce,[13] with input from his subordinates, Arthur Murray and Kell.[14]  Bruce, Murray, and Kell all agreed that plaintiff's position should be eliminated.[15]  The other position eliminated belonged to video editor Parrish Murphy.[16]  KHOU discharged plaintiff on April 28, 2014.[17]  Plaintiff received $17,831 as a severance payment without having to sign a waiver or release.[18]

On June 4, 2015, KHOU rehired plaintiff at an increased salary when a position opened after an existing video editor transferred to another department.[19]

---

[12]Id. at 16:4-9, Exhibit B to Defendants' MSJ, Docket Entry No. 27-2, p. 5.

[13]Id. at 16:10-18:3, Exhibit B to Defendants' MSJ, Docket Entry No. 27-2, pp. 5-7.

[14]Id. at 10:12-21, 17:24-18:24, 58:15-18, Exhibit B to Defendants' MSJ, Docket Entry No. 27-2, pp. 2, 6-7, 18.

[15]Id. at 66:8-16, Exhibit B to Defendants' MSJ, Docket Entry No. 27-2, p. 19.

[16]Oral Deposition of Arthur Murray, p. 39:16-19, Exhibit D to Defendants' MSJ, Docket Entry No. 27-4, p. 5.

[17]Plaintiff's Deposition, p. 21:9-12, Exhibit A to Defendants' MSJ, Docket Entry No. 27-1, p. 4.  See also April 28, 2014, Termination Letter, Exhibit F to Defendants' MSJ, Docket Entry No. 27-6.

[18]Plaintiff's Deposition, p. 87:6-13, Exhibit A to Defendants' MSJ, Docket Entry No. 27-1, p. 29.

[19]Bruce Deposition, pp. 71:5-16, 119:10-21, Exhibit B to Defendants' MSJ, Docket Entry No. 27-2, pp. 20 and 31.  See also June 4, 2015, Re-Hire Letter, Exhibit H to Defendants' MSJ, Docket Entry No. 27-8.

### III.   Analysis

Plaintiff alleges that defendants discriminated against him on the basis of disability in violation of the ADA and interfered with his rights to take medical leave in violation of the FMLA by discharging him from his position as video editor in April of 2014. Defendants argue that they are entitled to summary judgment on plaintiff's ADA and FMLA claims because plaintiff is unable to present evidence capable of satisfying the elements of a prima facie case of discrimination under either of those statutes, and because plaintiff is unable to present evidence capable of showing that the legitimate, non-discriminatory reason for which he was discharged, i.e., implementation of a RIF, was a pretext for discrimination or for intent to interfere with rights guaranteed by the FMLA.[20]

### A.   Claims for Violation of the ADA

#### 1.   Applicable Law

Title I of the ADA prohibits discrimination against qualified individuals on the basis of disability and requires employers to make reasonable accommodations for otherwise qualified disabled employees.  42 U.S.C. § 12112(a); § 12112(b)(5)(A).  The ADA makes it unlawful for an employer to discriminate against "a qualified individual on the basis of disability. . ."  42 U.S.C. § 12112(a). The ADA defines "qualified individual" as "an individual who, with

---

[20]Defendants' MSJ, Docket Entry No. 27.

-6-

or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Disability is defined as:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(1)(A)-(C). See also Milton v. Texas Department of Criminal Justice, 707 F.3d 570, 573 (5th Cir. 2013).

Plaintiff may establish an ADA discrimination claim by using direct evidence or by using the indirect method of proof set forth in McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817 (1973). See Seaman v. CSPH, Inc., 179 F.3d 297, 300 (5th Cir. 1999). Direct evidence of discrimination "is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." Rachid v. Jack In The Box, Inc., 376 F.3d 305, 310 n.6 (5th Cir. 2004) (quoting Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 897 (5th Cir. 2002), cert. denied, 123 S. Ct. 2572 (2003)). Plaintiff has not cited direct evidence of discrimination and does not argue that this is a direct evidence case.

Plaintiff's initial burden under the McDonnell Douglas framework is to establish a prima facie case of discrimination based upon his disability by showing (1) he is disabled, (2) he was qualified for the job, (3) he was subjected to an adverse employment action because of his disability, and (4) he was

replaced by or treated less favorably than non-disabled employees. See Milton, 707 F.3d at 573 (citing Daigle v. Liberty Life Insurance Co., 70 F.3d 394, 396 (5th Cir. 1995)). In cases such as this that involve a general reduction in the employer's workforce, the Fifth Circuit uses a modified McDonnell Douglas test. See Amburgey v. Corhart Refractories Corp., Inc., 936 F.2d 805, 812 (5th Cir. 1991); Williams v. General Motors Corp., 656 F.2d 120, 127-28 (5th Cir. 1981), cert. denied, 102 S.Ct. 1439 (1982). While the Fifth Circuit does not appear to have addressed the elements of a prima facie ADA case arising from a RIF, other courts that have addressed the issue have applied the standard applicable to RIF cases involving other types of discrimination. See, e.g., Mathis v. BDO USA, LLP, Civil Action No. 4:13-cv-134, 2014 WL 975706, *4 (S.D. Tex. 2014). Accordingly, this court will apply the modified McDonnell Douglas test that the Fifth Circuit applies to RIF cases involving other types of discrimination.

In order to establish a prima facie case of discrimination using the modified McDonnell Douglas test, plaintiff must show that: (1) he was a member of a protected class; (2) he was adversely affected by the employer's decision; (3) he was qualified to assume another position; and (4) others who were not members of the protected class remained in similar positions or there is evidence showing that defendant intended to discriminate in reaching the decision at issue. See Palasota v. Haggar Clothing Co., 342 F.3d 569, 576 (5th Cir. 2003) (per curiam), cert. denied,

-8-

124 S. Ct. 1441 (2004) (stating in an age and gender discrimination case that the plaintiff "was not required to demonstrate . . . that he was . . . replaced. . . ."). <u>See also</u> <u>Woodhouse v. Magnolia Hospital</u>, 92 F.3d 248, 252 (5th Cir. 1996); <u>Nichols v. Loral Vought Systems Corp.</u>, 81 F.3d 38, 41 (5th Cir. 1996); <u>Bauer v. Albemarle Corp.</u>, 169 F.3d 962, 966 (5th Cir. 1999). "[T]o establish a *prima facie* case, a plaintiff need only make a very minimal showing." <u>Nichols</u>, 81 F.3d at 41 (quoting <u>Thornbrough v. Columbus and Greenville R.R. Co.</u>, 760 F.2d 633, 639 (5th Cir. 1985), <u>overruled on other grounds by</u> <u>St. Mary's Honor Center v. Hicks</u>, 113 S. Ct. 2742, 2749-50 (1993)). "A *prima facie* case raises an inference of unlawful discrimination." <u>Id.</u> (citing <u>Rhodes v. Guiberson Oil Tools</u>, 75 F.3d 989, 992 (5th Cir. 1996) (en banc)).

If plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for its actions. <u>Daigle</u>, 70 F.3d at 396 (citing <u>Texas Department of Community Affairs v. Burdine</u>, 101 S. Ct. 1089, 1093 (1981)). "If the employer produces any evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden of production." <u>Id.</u> (quoting <u>St. Mary's Honor Center</u>, 113 S. Ct. at 2748).

Once the employer articulates a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff who may prove intentional discrimination by

proceeding under one of two alternatives:  the pretext alternative or the mixed-motives alternative.  See Pinkerton v. Spellings, 529 F.3d 513, 519 (5th Cir. 2008) (per curiam) ("Under a plain reading of the statute, and in accord with the position of other circuits, we conclude that the ADA does not require 'sole causation.'  The proper causation standard under the ADA is a 'motivating factor' test.").[21]  The pretext alternative involves "offer[ing] sufficient evidence to create a genuine [dispute] of material fact '[] that the defendant's reason is not true, but is instead a pretext for discrimination.'"  Rachid, 376 F.3d at 312.  Under the mixed-motives alternative, the plaintiff must offer sufficient evidence to create a genuine issue of material fact "that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic."  Id.  See Maples v. University of Texas Medical

---

[21]Subsequent to Pinkerton, 529 F.3d at 513, the Supreme Court ruled that the mixed-motives alternative is unavailable in the similarly-worded discrimination provision in the Age Discrimination in Employment Act ("ADEA").  See Gross v. FBL Financial Services, Inc., 129 S. Ct. 2343 (2009).  Gross held that the mixed-motives argument was unavailable because, among other reasons, the ADEA's relevant provision prohibits discrimination "because of" age instead of employing Title VII's broader prohibition of discrimination that is a "motivating factor" for an employment practice.  Id. at 2349-50.  See also University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517 (2013) (holding that the mixed-motive argument is not available in the context of a Title VII retaliation claim, which must be proved according to traditional principles of but-for causation).  The court need not decide whether the mixed-motive analysis is available under the ADA because, even assuming arguendo that it is, plaintiff has argued that the pretext analysis, not the mixed-motives analysis, applies to the facts of this case.

-10-

Branch at Galveston, 524 Fed. App'x. 93, 94-95 (5th Cir. 2013) (per curiam) (applying the "motivating factor" standard in an ADA employment discrimination case).  If the employee offers evidence capable of proving that discrimination was a motivating factor in the employment decision, the burden shifts to the employer to prove that it would have taken the same action despite the discriminatory animus.  Rachid, 376 F.3d at 312.  Here, plaintiff argues only that defendants' stated reasons for his discharge are pretexts for discrimination.[22]

## 2.  Application of the Law to the Undisputed Facts

### (a)  Plaintiff Establishes a Prima Facie Case

"For the purposes of summary judgment, Defendants do not dispute that Plaintiff is considered disabled under the ADA, that Plaintiff was qualified for his job, and that Plaintiff suffered an adverse employment decision when Defendants terminated his employment pursuant to the [RIF]".[23]  Asserting that they "eliminated Plaintiff's position,"[24] defendants argue that plaintiff is unable to demonstrate that they terminated him because of his disability since they "did not even discuss Plaintiff's

---

[22]Plaintiff's Response, p. 14, Docket Entry No. 30, p. 18 ("Pretext can be shown in many ways.  Here the plaintiff offers five. . .").

[23]Defendants' MSJ, p. 13, Docket Entry No. 27, p. 19.

[24]Id. at 14, Docket Entry No. 27, p. 20 (citing Bruce Deposition, p. 124:9-24, Exhibit B to Defendants' MSJ, Docket Entry No. 27-2, p. 32).

disability"[25] when assessing his EDR proficiency or determining which video editor positions to eliminate.   Defendants also argue that

> [a]t the time of his termination, there was no reason his disability would adversely affect his ability to execute his EDR functions.   Consequently, there would be no reason for Defendants to terminate Plaintiff on the basis of his disability — and Defendants did not.   Instead, Bruce decided to terminate Plaintiff's employment based on his perception of Plaintiff's commitment to EDR, which had nothing to do with his disability.   Plaintiff had the physical ability to work in EDR, and did work in EDR. Accordingly, there is no evidence Defendants terminated Plaintiff's employment because of his disability.[26]

Defendants also argue that there is ample evidence that they had no discriminatory animus against the plaintiff because KHOU hired him knowing he had a disability, employed him for nearly 19 years, could have — but did not — terminate him during previous RIFs, provided him a severance package, and rehired him at an increased salary when a video editor position became available.[27]

Citing <u>Bauer</u>, 169 F.3d at 966, plaintiff argues that a prima facie case exists because it is undisputed that defendants discharged two video editors in the RIF,[28] but "[six] employees who

---

[25]<u>Id.</u>

[26]<u>Id.</u> at 13-14, Docket Entry No. 27, pp. 19-20.

[27]<u>Id.</u> at 15-16, Docket Entry No. 27, pp. 21-22 (citing Plaintiff's Deposition, pp. 87:6-13, 104:6-10, 110:14-16, Exhibit A to Defendants' MSJ, Docket Entry No. 27-1, pp. 29, 34, and 37).

[28]Bruce Deposition, p. 16:4-9, Exhibit B to Defendants' MSJ, Docket Entry No. 27-2, p. 5 ("A. We had a corporate mandate to do a reduction in force across the board and the station.   It involved
(continued...)

held the same editor position remained after the lay-off."[29] Plaintiff argues "[t]his is not a lay-off where all the people in a certain class found themselves without a job. Indeed, Gannett retained all of Caldwell's fellow employees except for one who had been repeatedly caught sleeping on the job."[30] In Bauer the Fifth Circuit stated that "[w]hen the employer does not plan to replace the discharged plaintiff, the fourth element is 'that after [the] discharge others who were not members of the protected class remained in similar positions.'" Id. (quoting Vaughn v. Edel, 918 F.2d 517, 521 (5th Cir. 1990)).

The court is not persuaded by defendants' argument that plaintiff has failed to present evidence capable of establishing a prima facie case. Defendants do not dispute that plaintiff was disabled, that plaintiff was qualified for the video editor position, or that plaintiff suffered an adverse action when he was selected as one of two video editors discharged in the RIF mandated by KHOU's new owner, Gannett. Asserting that one non-disabled video editor was discharged along with plaintiff, defendants argue

---

[28](...continued)
eliminating some departments and reducing the force in others. And for news, it affected four of my people. Two of them truck operators, who operated remote trucks, and two of them editors.").

[29]Plaintiff's Response, p. 13, Docket Entry No. 30, p. 17.

[30]Id. See Bruce Deposition, pp. 17:24-18:3, Exhibit B to Defendants' MSJ, Docket Entry No. 27-2, pp. 6-7 ("Q. Now, backing up, so you know that there were two editors you need to lay off. And how many editors were there at the time? A. I seem to recall that there were -- I think there were eight.").

that plaintiff cannot show either that he was discharged because of his disability or that he was treated differently than similarly situated video editors.[31] Since, however, defendants do not dispute that plaintiff was qualified for the position of video editor, that six video editors were retained during the RIF, and that none of the six retained video editors were disabled, plaintiff has presented evidence capable of showing both that he was treated less favorably than the non-disabled video editors who were not discharged, and that others who were not members of his protected class remained in similar positions.

In Thornbrough, 760 F.2d at 644, a RIF case involving age discrimination, the Fifth Circuit stated that "what is suspicious in reduction-in-force cases is that the employer fired a qualified, older employee but retained younger ones . . .;" and the Fifth Circuit found that such a scenario "serves the primary function of the prima facie case doctrine." Id. What is suspicious in the present case is that the defendants fired a qualified, disabled employee but retained non-disabled employees performing the same job duties; such a scenario serves the primary function of the prima facie case doctrine. Accordingly, the court concludes that plaintiff has established a prima facie case regardless of whether

---

[31]Defendants' MSJ, pp. 14-15, Docket Entry No. 27, pp. 20-21 (citing Plaintiff's Deposition, p. 61:8-13, Exhibit A, Docket Entry No. 27-1, p. 21 ("Q. So you and Parrish both lost your jobs in that workforce reduction, right?  A. Yes.  Q. To your knowledge, is Parrish a person with a disability?  A. No.").

the evidence is analyzed under the typical four-part test for
establishing a prima facie case, or the typical four-part test as
modified for RIF cases.  See Gowesky, 321 F.3d at 511 (typical
four-part test for establishing a prima facie case); Bauer, 169
F.3d at 966 (quoting Vaughn, 918 F.3d at 521 (four-part test
modified for RIF cases)).

>            (b)   Defendants Cite a Legitimate, Non-Discriminatory
>                  Reason for the Adverse Action

Defendants argue that they are entitled to summary judgment on
plaintiff's ADA claim because plaintiff was discharged as part of
a RIF that occurred at KHOU in the spring of 2014.[32]  Defendants
explain that plaintiff was one of two video editors selected for
discharge during the RIF due to management's perception regarding
his commitment to EDR:

> In order to determine which of the 8 video editors'
> position[s] to eliminate, Bruce relied on the input from
> his subordinates, Art Murray ("Murray") and Kell. Bruce,
> Murray, and Kell looked at the entire video editor staff
> in making the decision, with a specific focus on the
> evolving duties of a video editor—namely that those
> duties had transitioned, and continued to transition,
> from traditional video editing duties to EDR related
> duties. In order to facilitate the process, Bruce asked
> Murray and Kell to provide suggestions on which positions
> to eliminate, but retained the ultimate decision himself.
> The decision was to be based on their perception of how
> experienced the video editor was with EDR duties, the
> decision was not to be based on seniority or appraisals.

---

[32]Id. at 13, Docket Entry No. 27, p. 19.  See also Oral
Deposition of Shannon Hunter, Exhibit D to Plaintiff's Response,
p. 62:8-10, Docket Entry No. 30-4, p. 12 (stating that KHOU was
bought in December of 2013).

This placed a premium on an editor's capability to perform EDR functions.

After reviewing all of the video editors, Bruce, Kell, and Murray believed that Plaintiff had not taken the initiative to spend as much time in EDR as other members of the edit staff. Consequently, Plaintiff was not as experienced in EDR duties as the other editors. This concerned Bruce because Defendants trained Plaintiff in EDR functions and provided him the opportunity to grow in that area, but Plaintiff did not express a desire to learn EDR as well as the other editors. Bruce himself observed multiple other editors who were better versed in EDR than Plaintiff. Murray also rated Plaintiff in the bottom tier of editors in EDR job responsibilities at that time. Bruce, Murray, and Kell never discussed Plaintiff's disability while discussing the layoff or Plaintiff's EDR proficiency.

Due to their perception regarding Plaintiff's commitment to EDR, the three unanimously determined that Plaintiff was one of the video editors whose position should be eliminated.[33]

Defendants have articulated a legitimate, non-discriminatory reason for discharging the plaintiff, i.e., the RIF, coupled with the decision-maker's belief that plaintiff was "not as experienced in EDR duties as the other editors."[34] "If believed by the trier of fact, this reason would support a finding that unlawful discrimination was not the cause of the discharge. Therefore, the presumption raised by [plaintiff's] prima facie case disappears." Nichols, 81 F.3d at 41. See Equal Employment Opportunity Commission v. Texas Instruments Inc., 100 F.3d 1173, 1181 (5th Cir. 1996) (recognizing that a RIF "is itself a legitimate,

---

[33]Id. at 8-9, Docket Entry No. 30, pp. 14-15.

[34]Id.

-16-

nondiscriminatory reason for discharge"). Accordingly, the court concludes that defendants have met their burden to produce evidence of a legitimate, nondiscriminatory reason for plaintiff's discharge.

### (c) Plaintiff Fails to Cite Evidence Capable of Establishing Pretext

Plaintiff does not dispute that the RIF occurred and does not argue that the RIF was a pretext for discrimination. Instead, asserting that the defendants' legitimate, non-discriminatory reason for discharging him must not only show that there was a RIF, but also that there was a non-discriminatory reason why plaintiff was selected for discharge during the RIF, plaintiff offers five arguments for why the evidence raises a genuine issue of material fact that defendants' stated reason for selecting him for discharge in the RIF is not true but, instead, pretext for disability discrimination.

### (1) No Evidence Plaintiff Was Segregated

Citing 42 U.S.C. § 12112(b)(1), the section of the ADA that identifies "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities, or status of such . . . employee because of the disability of such . . . employee," plaintiff argues that "limiting and segregating . . . is precisely what happened [to him]."[35] Citing Olmstead v.

---

[35]Plaintiff's Response, p. 15, Docket Entry No. 30, p. 19.

L.C. ex rel. Zimring, 119 S. Ct. 2176, 2181 (1999), and Frame v.
City of Arlington, 657 F.3d 215, 231 (5th Cir. 2011), plaintiff
argues that "[t]he defendants never scheduled [him] in EDR and that
failure caused his dismissal."[36]   Plaintiff also argues that
defendants

> chose to assign him only traditional editing work and
> then blame him for not showing initiative to do EDR
> work. . . No one discussed with [him] any perception that
> he supposedly lacked initiative. . . And no other editor
> — but the one with a disability — had to show initiative.
> They were just scheduled to do their shift.   Everyone
> else, but him.   When a standard is required only for the
> person with the disability, that is impermissible.   It is
> holding the person with the disability to a higher
> standard, which disability law does not permit.[37]

The court is not persuaded that plaintiff's segregation
argument has merit because the segregation addressed by the courts
in Olmstead, 119 S. Ct. at 2181, and Frame, 657 F.3d at 231, was
physical segregation resulting from alleged violations of Title II
or the public services portion of the ADA.   At issue in Olmstead
was "whether the proscription of discrimination may require
placement of persons with mental disabilities in community settings
rather than in institutions."   119 S. Ct. at 2181.   At issue in
Frame was whether Title II of the ADA applied to newly built and
altered public sidewalks.   657 F.3d at 221, 231.   Neither Olmstead
nor Frame concerns disability discrimination by an employer.

---

[36]Id.

[37]Id. at 15-16, Docket Entry No. 30, pp. 19-20.

### (2)   No Evidence Defendants Changed Stories

Citing Gee v. Principi, 289 F.3d 342, 347-48 (5th Cir. 2002),
plaintiff argues that "[i]nconsistent, shifting reasons offered by
the [defendants] constitute sufficient evidence of pretext to
support a finding of liability. . . . [T]he record evidence reveals
that defendants have changed their stories."[38]  In Gee, 289 F.3d at
347-48, the plaintiff and another person were being considered for
a position at the Department of Veterans' Affairs.   When the
plaintiff was not selected she sued the defendant for retaliation
for having complained of sex discrimination two years earlier.   The
district court granted summary judgment to the defendant after
concluding that the plaintiff had failed to present evidence from
which a reasonable fact-finder could conclude that the defendant's
legitimate, non-discriminatory reason for not selecting the
plaintiff was a pretext for retaliation, i.e., that Dr. Gibbs
selected the other candidate because he believed that she would be
able to get along well with physicians, and because he had received
negative feedback on the plaintiff from several of her coworkers.
The Fifth Circuit reversed, explaining that the plaintiff had
satisfied her burden of raising a genuine issue of fact as to
pretext by pointing to

> discrepancies between Gibbs' affidavit given during the
> investigation and his testimony at the administrative
> hearing.   Specifically, [plaintiff] note[d] that although

---

[38]Plaintiff's Response, p. 16, Docket Entry No. 30, p. 20.

> [Gibbs] initially denied that he participated in a
> meeting relating to [her] position, Gibbs later admitted
> that he had attended such a meeting.  Asked why he did
> not disclose this fact during the investigation, he
> responded that he did not know.   In addition to this
> omission, after originally claiming that others were not
> involved in the selection process, Gibbs later admitted
> that he conferred with several people.   Moreover,
> although Gibbs at first was unable to recall the
> substance of the statements made about [the plaintiff] at
> the meeting, he later testified that everyone made
> comments and the general tenor of those comments was
> unfavorable.

Gee, 289 F.3d at 347-48.  Thus, in Gee, 289 F.3d at 347-48, the

Fifth Circuit held that the plaintiff had satisfied her burden of

raising a genuine issue of fact as to pretext by pointing to

factual discrepancies in the decision-maker's statements regarding

his reasons for the adverse employment action at issue.  See also

Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc., 482 F.3d 408,

412 n.11 (5th Cir. 2007) (citing Gee, 289 F.3d at 347-48, for the

principle that "an employer's inconsistent explanations for its

employment decisions at different times permits a jury to infer

that the employer's proffered reasons are pretextual").

The court is not persuaded by plaintiff's argument that

defendants' changed their story regarding the reasons for his

discharge.  Defendants have consistently maintained that plaintiff

was discharged during a RIF, that the decision-maker, Bruce, looked

at the entire video editor staff with a specific focus on the

evolving duties of a video editor, i.e., that those duties were

changing from traditional video editing to EDR, and that plaintiff

had the least amount of EDR experience of all the video editors.

As evidence that defendants' changed their story over time, plaintiff asserts that while defendants did not explain the rationale for the lay-off decision when they discharged him, in letters sent to his counsel and to the EEOC, Gannett's counsel, Vincent P. Floyd, stated that plaintiff had been selected for the RIF because he refused to do his job.   The letters on which plaintiff relies are insufficient to raise a fact issue for trial because they were not written by the decision-maker, Bruce.  Unlike the plaintiff in Gee, who pointed to factual discrepancies in the decision-maker's statements regarding his reasons for the adverse employment action at issue, plaintiff has not pointed to any factual discrepancies in Bruce's stated reasons for the adverse employment action at issue here.  Instead, the undisputed evidence shows that in the spring of 2014 Gannett mandated a RIF at KHOU[39] and instructed KHOU to eliminate two of its eight video editor positions.[40]   KHOU's News Director, Bruce, made the ultimate decision of which positions to eliminate,[41] but relied on input from his subordinates, Murray and Kell.[42]   Defendants have offered

---

[39]Bruce Deposition, pp. 15:23-16:21, Exhibit B to Defendants' MSJ, Docket Entry No. 27-2, pp. 4-5.

[40]Id. at 16:4-9, Exhibit B to Defendants' MSJ, Docket Entry No. 27-2, p. 5.

[41]Id. at 16:10-18:3, Exhibit B to Defendants' MSJ, Docket Entry No. 27-2, pp. 5-7.

[42]Id. at 10:12-21, 17:24-18:24, 58:15-18, Exhibit B to Defendants' MSJ, Docket Entry No. 27-2, pp. 2, 6-7, 18.

uncontroverted evidence that the ability to perform EDR was the primary consideration for continued employment, and that after reviewing all of the video editors, Bruce, Murray, and Kell agreed that plaintiff's position should be eliminated because

> Plaintiff had not taken the initiative to spend as much time in EDR as other members of the edit staff. Consequently, Plaintiff was not as experienced in EDR duties as the other editors. This concerned Bruce because Defendants trained Plaintiff in EDR functions and provided him the opportunity to grow in that area, but Plaintiff did not express a desire to learn EDR as well as the other editors. Bruce himself observed multiple other editors who were better versed in EDR than Plaintiff. Murray also rated Plaintiff in the bottom tier of editors in EDR job responsibilities at that time.[43]

Because plaintiff has failed to cite any evidence capable of establishing that the decision maker — Bruce — has changed his stated reasons for selecting plaintiff for the RIF over time, the fact situation in this case is distinguishable from the one presented in Gee. See Squyres v. Heico Companies, L.L.C., 782 F.3d 224, 234 (5th Cir. 2015) (distinguishing Gee from facts showing that "when the alleged inconsistent statements are considered in their full context, the inconsistencies disappear").

### (3) No Evidence that Defendants' Reasons for Selecting Plaintiff for the RIF Were Not True

Citing Reeves, 120 S. Ct. at 2108, plaintiff asserts "[p]roving that the defendant is telling a falsehood is a standard way to prove pretext, . . . and this case has mendacity in

---

[43]Defendants' MSJ, p. 9, Docket Entry No. 27, p. 15.

spades."[44] Stating "defendants justified this termination to a
federal agency on grounds that it now admits are untrue,"[45]
plaintiff argues:

> Defendant[s] first claimed "Caldwell repeatedly made it
> clear to his supervisors and his colleagues that working
> in EDR was not why he was at KHOU and he preferred not
> [to] work in EDR." . . . Neither of [plaintiff's]
> immediate supervisors know anything about this. . . .
> They also asserted that "Caldwell frequently conveyed to
> other editors on his shift that he would pick up their
> assignments so they could work in EDR instead of
> him." . . . This never happened either. Neither of
> [plaintiff's] immediate supervisors know anything about
> this.
>
> . . .
>
> And the defendants state that "Plaintiff Prioritized
> Traditional Editing Duties." . . . The defendants, not
> [plaintiff], assigned him these duties. The supervisors
> never discussed his time performing EDR duties with
> him.[46]

The court is not persuaded by plaintiff's argument that
defendants' stated reasons for selecting him for discharge during
the RIF are not true. The court has already concluded that
plaintiff's argument that defendants changed their story over time
has no merit. Plaintiff does not dispute that he was less
experienced in EDR than the video editors who were retained, and
does not offer any evidence from which a reasonable fact-finder
could conclude otherwise.

_____

[44]Plaintiff's Response, p. 17, Docket Entry No. 30, p. 21.

[45]Id.

[46]Id.

A plaintiff can raise a fact issue on the question of pretext in a RIF case by adducing evidence that "he was *clearly* better qualified than . . . employees who were retained." Walther v. Lone Star Gas Co., 952 F.2d 119, 123 (5th Cir. 1992) (emphasis in original) (citing Thornbrough, 760 F.2d at 647). "However, this evidence must be more than merely subjective and speculative." Nichols, 81 F.3d at 42 (citing Molnar v. Ebasco Constructors, Inc., 986 F.2d 115, 119 (5th Cir. 1993); Elliott v. Group Medical & Surgical Service, 714 F.2d 556, 564 (5th Cir. 1983), cert. denied, 104 S. Ct. 2658 (1984)). The Fifth Circuit has held that

> the bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those disparities are "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."

Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 357 (5th Cir. 2001), abrogated on other grounds by National R.R. Passenger Corp. v. Morgan, 122 S. Ct. 2061 (2002) (quoting Deines v. Texas Department of Protective and Regulatory Services, 164 F.3d 277, 280-81 (5th Cir. 1999)).

Plaintiff has not presented any evidence from which a reasonable fact-finder could conclude that he was clearly better qualified than the video editors who were retained. Instead, plaintiff argues that

> one of [his] colleagues who was retained would regularly shop on-line or be on his personal facebook account for

-24-

> hours before he finally announced that he was starting to
> work. . . . And he was not the only one.  Another was
> habitually late to work by up to an hour, another by
> twenty to thirty minutes. . . . Another was not only less
> productive but consistently rude to her colleagues.[47]

Plaintiff's contentions that some of the retained video editors were regularly engaged in non-work-related activity while at work, were less productive, and were rude to their colleagues are not sufficient to raise a fact issue for trial because these arguments merely challenge the defendants' decision to use EDR ability and experience as the primary consideration for continued employment. Discrimination statutes are not intended to be vehicles for judicial second guessing of business decisions, nor are they intended to transform the courts into personnel managers. Thornbrough, 760 F.2d at 647.

### (4) No Evidence Defendants Denied Plaintiff Opportunity

Citing the testimony of his former supervisors, plaintiff argues that this case is analogous to Vaughn, 918 F.2d at 517, a Title VII case in which an African-American plaintiff had been discharged for poor performance.  In Vaughn the plaintiff's department manager admitted that he told the plaintiff's supervisors not to confront her about her poor work performance and not to counsel her on how to improve for fear such criticism would

---

[47]Id. at 16, Docket Entry No. 30, p. 20 (citing Plaintiff's Deposition, pp. 61-62, Exhibit B to Plaintiff's Response, Docket Entry No. 30-2, pp. 23-24.

prompt a race-discrimination lawsuit. <u>Vaughn</u>, 918 F.2d at 519, 521. The Fifth Circuit found that the employer treated Vaughn differently than other employees because she was African-American, agreed with her contention that "racial discrimination was the reason she was in the position to be fired," and concluded that "[a]lthough Vaughn's race may not have directly motivated the . . . decision to fire her, race did play a part . . . in Vaughn's employment relationship with Texaco. . ." <u>Id.</u> at 522. The <u>Vaughn</u> court explained that where discrimination taints an employee's ability to improve her work performance, the employee was entitled to an inference that her performance might have been better had she been given an equal opportunity to improve. <u>Id.</u> at 523.

Plaintiff's argument that defendants denied him opportunity and that this case is analogous to <u>Vaughn</u> is based on the testimony of his former supervisor, Butera, who stated that he stopped scheduling plaintiff to work in EDR when plaintiff received his leg brace because he feared that plaintiff could be injured in the tight EDR work space.[48] Undisputed evidence shows that when Butera left and Kell became plaintiff's supervisor, Kell maintained the EDR schedule established by Butera, and that Kell, like Butera, did not schedule plaintiff to work a regular rotation in EDR. Plaintiff argues therefore that the reason he was subject to discharge during the RIF, i.e., his lack of experience with EDR,

---

[48]Butera Deposition, pp. 15:13-18:17, 24:13-25:7, Exhibit C to Plaintiff's Response, Docket Entry No. 30-3, pp. 5-8, 11-12.

was caused by defendant's failure to schedule him to work a regular rotation in EDR.   Citing the deposition testimony of Bruce's subordinates, Murray and Kell, plaintiff argues that he was unaware that the failure to accrue EDR experience could adversely impact his evaluations or ranking because his supervisors never counseled or criticized him for not spending more time in EDR.   Plaintiff argues that

> [n]o one ever shared with [him] that he needed to work more in EDR or that there was any dissatisfaction with his job performance.  Only the person with the disability was denied the right to work in EDR and then that fact was used as a "gotcha" justification for the lay-off.   In other words, [plaintiff] suffered for one reason and one reason alone — he had a disability.[49]

Thus, plaintiff argues that defendants withheld the opportunity to gain EDR experience from him, a disabled employee, while providing it to non-disabled employees.

The court is not persuaded by plaintiff's argument that defendants' denial of the opportunity to work in EDR is evidence from which a reasonable fact-finder could conclude that the defendants' stated reason for discharging him during the RIF is not true but is instead a pretext for discrimination.  Although undisputed evidence shows that Butera stopped scheduling plaintiff to work in EDR because he feared for plaintiff's safety due to the leg brace he wore for his disability, and that Kell continued Butera's practice of not scheduling plaintiff to work in EDR, this

---

[49]Plaintiff's Response, p. 19, Docket Entry No. 30, p. 23.

case is distinguishable from <u>Vaughn</u>, 918 F.2d at 517, because plaintiff has failed to present any evidence from which a reasonable fact-finder could conclude that defendants denied him EDR training, that he did not know that other video editors were working in EDR more than he, or that defendants mislead him to believe that lack of EDR experience would not adversely impact his evaluations or his ranking amongst his peers.

The reason why plaintiff was not scheduled to work regular shifts in EDR and the adverse impact that his failure to work regularly scheduled shifts in EDR had on his performance reviews are evidenced in both the performance reviews that plaintiff received from Butera and in Butera's undisputed testimony.   In pertinent part Butera testified:

> Q.   Looking at the second page of this review, which is Caldwell 205, do you see under "Individual/Team Perf Goals," there is a "Comments" section?
>
> A.   Yes.
>
> Q.   And what does that say at the beginning?   What's the first sentence of that?
>
> A.   "Jerry is up to speed when it comes to EDR, but has been limited as to what he can do in there with his leg surgery."
>
> Q.   And what does that refer to?   I mean why was, why did his leg surgery cause, if you recall, a limitation in EDR?
>
> A.   After the big surgery, I believe this is where the big brace, like a large halo brace, he had to have his leg elevated.   EDR is tight in spots, large counter, where we do the main operations for tune in shots, taking feeds, and also a room with a lot

of high traffic, high speed traffic, editors
running scripts, cutting through to the booth,
photographers running in, scrambling to load tapes.
And the way the room is structured, there's three
major blind spots, full ninety degree angles coming
around corners, to get in or out or around the
racks.

I felt at the time it was not a safe
environment for him to be in there due to that
traffic.   And I didn't want to put him in any
health jeopardy because of all that.

Q.   So if I'm hearing you correct, the issue had
nothing to do with his willingness to do work or
his, you know, he doesn't take initiative or
anything like that.  It was a medical issue?

A.   Yes.

Q.   And you have rated him here as meeting standards as
opposed to exceeding standards.  Is that because he
frankly just didn't have that much time in EDR
because of that?

A.   He was able to do the job.  I mean I could bring
him in there in an emergency.  But he wasn't doing
it.  So it was a meets skill set, capable of doing
it, just wasn't doing it.

Q.   And now, let's look forward then to the 2010/2011
time frame.  .  .

.  .  .

Now, if we can look then at Exhibit 6, on the
performance appraisal from 8-2010 to 8-2011.  Do
you see that?

A.   Yes.

Q.   And at the bottom of the first page it's talking
about job requirements.  Do you see that?

A.   Yes.

Q.   And so EDR is the last thing on the page from the
appraisal.  And at the top of the second page is
again your assessment, correct --

A.    Yes.

Q.    -- under "Comments."  And could you read what it says there?

A.    "Jerry has been limited in his EDR duties due to a medical issue, but can be called upon to complete the tasks when needed. He stays up to date on the changes in systems in the feed room, and has adapted well with the new systems we have in place."

Q.    And is that a true statement?

A.    Yes.

Q.    And again, you have rated him as "meets standards." Is that for the same reason you discussed in the 2007/2008 review?

A.    Yes.

Q.    He has the capability, but he really wasn't doing much of it?

A.    Yes.

Q.    Although, in a pinch, you could certainly call on him?

A.    Yes.

Q.    And is the reason he was limited the same reason that he was limited in '07 and '08, that you discussed with me, about the layout, his medical condition?

A.    Yes.[50]

Like the plaintiff in <u>Vaughn</u>, 918 F.2d at 517, from whom the defendant secretly withheld negative performance reviews because of her race, the plaintiff in this case was not scheduled to work

_____

[50]Butera Deposition, pp. 15:6--16:23; 17:8-18:17, Exhibit C to Plaintiff's Response, Docket Entry No. 30-3, pp. 5-8.

regular shifts in EDR because of his disability.  But unlike the plaintiff in Vaughn, who was denied counseling that could have allowed her to improve her performance relative to her peers, the plaintiff in this case was neither given false reviews that failed to alert him to a potential need to improve his performance relative to his peers nor denied EDR training needed to do so. Because plaintiff has failed to present any evidence from which a reasonable fact-finder could conclude that defendants misled him to believe that lack of EDR experience would not adversely impact his evaluations or his ranking amongst his peers, the fact situation in this case is distinguishable from Vaughn.

### (5) No Evidence Defendants Denied Plaintiff the Benefit of the Doubt

Citing Trujillo v. PacifiCorp, 524 F.3d 1149, 1160 (10th Cir. 2008), plaintiff argues that defendants refused to give him the benefit of the doubt.  Plaintiff argues that

> [e]ven though they admit [that] he was bringing value to the organization, they never once asked him about his willingness to work in EDR. . . . They never once scheduled him to work in EDR. . . . They never asked him to demonstrate his capabilities in EDR.  Instead, they scheduled him on other projects and then faulted him for not flouting their directions.[51]

Defendants argue that

> Trujillo has nothing to do with a reduction-in-force scenario.  There was no "benefit of the doubt" to be applied in an investigation into any poor performance.

---

[51]Plaintiff's Response, p. 19, Docket Entry No. 30, p. 23.

-31-

Defendants had to give an equal "benefit of the doubt" to all of its editors, which it did.  Then, after reviewing each editor's familiarity with respect to EDR duties, Defendant determined it would terminate both Plaintiff and Murphy pursuant to the reduction-in-force.[52]

In Trujillo the Tenth Circuit held that the plaintiffs introduced sufficient evidence to support a finding that their firing for timecard violations was pretextual.  Id. at 1159.  The primary evidence was that the defendant had disciplined other employees accused of serious violations, but had terminated the plaintiffs.  Id. at 1158-59.  The court stated that "[a]lthough the couple together [had] served [the defendant] for 28 years, they were never given the benefit of the doubt during the investigation.  Rather, the company seemingly relied only on evidence to the detriment of the [plaintiffs] and failed to interview key witnesses."  Id. at 1160.  The court also credited evidence that the procedure the defendant used to audit the plaintiffs' time cards was flawed.  Id. at 1159.

The facts of this case are distinguishable from the facts in Trujillo because the plaintiff in this case was neither discharged nor selected for the RIF for misconduct, and because defendant never conducted any investigation in which plaintiff could or should have been given a benefit of the doubt.  Moreover, although plaintiff argues that defendants improperly relied on a subjective procedure for selecting him for discharge as part of the RIF,

---

[52]Defendants' Reply in Support of Their Motion for Summary Judgment ("Defendants' Reply"), p. 10, Docket Entry No. 31, p. 14.

plaintiff has not cited any evidence capable of contradicting defendants' evidence that the future of video editing was EDR, or that he was the least experienced and least proficient in EDR. Accordingly, the court is not persuaded that plaintiff's contention that defendants' failure to give him the benefit of the doubt is sufficient to raise a fact issue as to pretext.

### 3. Conclusions as to Plaintiff's ADA Claims

Defendants have articulated legitimate, non-discriminatory reasons for selecting plaintiff as one of two video editors to be discharged in the RIF. Plaintiff has the burden to cite evidence capable of establishing that the defendants' stated reasons are not the true reasons for his discharge but are, instead, pretexts for disability discrimination. Plaintiff has provided no such evidence. Plaintiff does not dispute that EDR is a critical skill for video editors, that he had less experience and proficiency in EDR than the video editors who were not discharged, or that his supervisors did not correctly perceive his commitment to EDR to be less than that of those other video editors. Nor has plaintiff cited any evidence from which a reasonable fact-finder could conclude that the RIF was a sham or a pretext for disability discrimination, or that even if the RIF was legitimate on its face, the defendants implemented it in such a way that disability was impermissibly used as a factor to determine which employees were discharged.

Even if the court could conclude that plaintiff had raised a genuine issue of material fact on the question of pretext, the court would nevertheless conclude that defendants are entitled to summary judgment on this record. "[T]here [are] instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." Reeves, 120 S. Ct. at 2109. The plaintiff might create "only a weak issue of fact as to whether the employer's reason was untrue and there [may be] abundant and uncontroverted independent evidence that no discrimination had occurred." Id. It is "possible for a plaintiff's evidence to permit a tenuous inference of pretext and yet be insufficient to support a reasonable inference of discrimination." Crawford v. Formosa Plastics Corp., Louisiana, 234 F.3d 899, 903 (5th Cir. 2000) (citing Travis v. Board of Regents of the University of Texas System, 122 F.3d 259 (5th Cir. 1997), cert. denied, 118 S. Ct. 1166 (1998)). Assuming that plaintiff has raised a genuine issue of fact concerning pretext, it is a weak issue of fact, and there is no evidence from which a reasonable fact-finder could conclude that the defendants' actions were caused by discrimination based on disability. Accordingly, the court concludes that plaintiff has failed to present evidence capable of establishing pretext, and plaintiff's long history of employment at KHOU undermines any suggestion of pretext.

## B. Claims for Violation of the FMLA

Plaintiff alleges that defendants willfully discriminated against him and interfered with his rights under the FMLA by discharging him before he intended to take FMLA-covered leave. Plaintiff alleges that he "was qualified for and was entitled to FMLA leave. Because the defendants fired [him] shortly after he had announced the need for FMLA leave for surgery, it preemptively fired him in bad faith to deny him that leave."[53] Defendants argue that they are entitled to summary judgment on plaintiff's FMLA claims because plaintiff never took or requested FMLA leave and because plaintiff cannot show that their legitimate, non-discriminatory reason for his discharge — inclusion in a RIF — was pretext for interfering with his entitlement to FMLA leave.[54]

### 1. Applicable Law

The FMLA allows eligible employees working for covered employers to take temporary leave for medical reasons without risk of losing their employment. See 29 U.S.C. § 2601(b)(1) and (2).[55] The FMLA contains both prescriptive and proscriptive provisions

---

[53]Plaintiff's First Amended Complaint, Docket Entry No. 7, p. 5 ¶ 13.

[54]Defendants' MSJ, pp. 18-21, Docket Entry No. 27, pp. 24-27.

[55]The FMLA applies to private-sector employers with fifty or more employees. 29 U.S.C. § 2611(4)(A)(i). An employee who has worked for a covered employer for at least twelve months is eligible for FMLA leave. 29 U.S.C. § 2611(2)(A). Defendants do not dispute either that they are covered employers or that plaintiff was eligible for FMLA leave.

-35-

which, together, seek to accommodate the legitimate interests of employers and to meet the needs of employees and their families. See Hunt v. Rapides Healthcare System, LLC, 277 F.3d 757, 763 (5th Cir. 2001). Prescriptive provisions of the FMLA allow an eligible employee to take up to twelve weeks of unpaid leave to care for himself if the employee suffers from a serious health condition that makes the employee unable to perform the functions of his position. Id. (citing 29 U.S.C. § 2612(a)(1)).[56] At the conclusion of a qualified leave period the employee is entitled to reinstatement to his former position, or to an equivalent one, with the same terms and benefits. 29 U.S.C. § 2614(a). Proscriptive provisions of the FMLA make it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a). The FMLA provides a private right of action against employers who violate its provisions. 29 U.S.C. § 2617.

Here, plaintiff states that his FMLA claim is not a retaliation claim but, instead, a claim for interference with his

---

[56] 29 U.S.C. § 2612(a)(1) provides in relevant part that

[A]n eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:

. . .

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

entitlement to FMLA leave.[57]   See Cuellar v. Keppel Amfels, L.L.C.,
731 F.3d 342, 348-51 (5th Cir. 2013) (Elrod, J., concurring)
(discussing substantive differences between FMLA claims based on
allegations of interference with entitlement to FMLA leave and
retaliation for having exercised FMLA rights).

> To establish a prima facie interference case, [plaintiff]
> must show that (1) []he was an eligible employee,
> (2) [Defendants were] employer[s] subject to the FMLA's
> requirements, (3) []he was entitled to leave, (4) []he
> gave proper notice of [his] intention to take FMLA leave,
> and (5) [Defendants] denied [him] the benefits to which
> []he was entitled under the FMLA.

Lanier v. University of Texas Southwestern Medical Center, 527
F. App'x 312, 316 (5th Cir. 2013) (per curiam) (citing Donald v.
Sybra, Inc., 667 F.3d 757, 761 (6th Cir. 2012)).   At issue here are
the fourth and fifth elements:   whether plaintiff gave proper
notice of his intention to take FMLA leave and whether defendants
denied plaintiff benefits to which he was entitled under the FMLA.

    2.   Application of the Law to the Facts

        (a)   Plaintiff Cites Evidence Capable of Raising Fact
              Issue as to Notice of Need for FMLA Leave

Plaintiff argues that defendants violated rights guaranteed by
the FMLA when it discharged him while he was intending to take FMLA
leave.   Plaintiff argues that while he

> had advised his employer of the upcoming surgery, the
> actual date had not been set.   But this is no barrier to
> recovery.   For obvious reasons, coverage under the FMLA

---

[57]Plaintiff's Response, p. 20, Docket Entry No. 30, p. 24.

does not turn upon whether an employee had the opportunity to obtain, complete, and turn in formal paperwork. . .

After all, [plaintiff] had alerted both his supervisor and the Human Resources manager about his need for FMLA leave for his final surgery. Ex. B. Caldwell Dep at 43-48, 111-112. He also shared with them that he would provide the official date for the surgery as soon as it was scheduled. *Id.* At the time, both officials said that was fine. Now, they profess not to recall those discussions. Ex. D., Hunter Dep. at 21-22; Ex. E, Kell Dep at 32. But their recollection of the conversations is hardly dispositive. Caldwell has testified under oath that he provided the notice. Ex. B. Caldwell Dep at 43-48, 111-112.

In fact, Caldwell has testified that he not only explained the need for the surgery to HR manager Shannon Hunter but started to provide a complete explanation of the background of his medical condition which led to this final surgery. Ex. B, Caldwell Dep. at 44. When he started to tell her this story, she asked him to stop because it was too gruesome. *Id.*; Ex. D, Hunter Dep. at 30.[58]

Although an employee need not use the phrase "FMLA leave," he must give notice that is sufficient to reasonably apprise his employer that his request to take time off could fall under the FMLA. <u>Lanier</u>, 527 F. App'x at 316 (citing <u>Manuel v. Westlake Polymers Corp.</u>, 66 F.3d 758, 762-64 (5th Cir. 1995); and 29 C.F.R. § 825.303(b)). The Fifth Circuit court does not apply categorical rules for the content of the notice but, instead, focuses on what is "practicable" based on the facts and circumstances of each individual. <u>Id.</u> An employer may have a duty to inquire further if statements made by the employee warrant it, but "the employer is

---

[58]<u>Id.</u> at 21, Docket Entry No. 30, p. 25.

not required to be clairvoyant." Id. (citing Satterfield v. Wal-Mart Stores, Inc., 135 F.3d 973, 980 (5th Cir.), cert. denied, 119 S. Ct. 72 (1998)). Here, plaintiff's allegations that he alerted his supervisor and Human Resource manager to his need for surgery could, if believed by a fact-finder, be sufficient to raise a fact issue as to whether plaintiff provided defendants notice of his need to take FMLA-covered leave.

> **(b)  Plaintiff Fails to Cite Evidence Capable of Establishing Pretext**

To avoid summary judgment in a case such as this where the defendant employer states a legitimate, non-discriminatory reason for discharging an employee who intends to take FMLA leave, i.e., discharge during a RIF, plaintiff must present evidence sufficient to raise a genuine issue of material fact for trial that defendants' stated reasons for discharging him are pretextual. This plaintiff fails to do so. Plaintiff argues only that the evidence of pretext submitted in response to defendants' motion for summary judgment on his ADA claims applies with equal force to his FMLA claims.[59] Plaintiff's allegations and evidence are insufficient to survive summary judgment on his FMLA claim, as no reasonable jury could find that he was denied FMLA leave for any reason other than defendants' stated reasons, i.e., shortly after plaintiff alleges that he notified his supervisor and defendants'

---

[59]Id. at 20-21, Docket Entry No. 30, pp. 24-25.

Human Resource manager of his intent to take FMLA leave, plaintiff was discharged as part of a RIF.   For the reasons stated in §§ III.A.2(c) and III.A.3, above, with respect to plaintiff's ADA claims the court concludes that plaintiff has failed to cite evidence from which a reasonable fact-finder could conclude that defendants' stated reasons for discharging plaintiff are not true but are, instead, pretexts for interfering with his right to take FMLA leave.   Accordingly, the court concludes that defendants are entitled to summary judgment on plaintiff's FMLA claims.

### IV.   Conclusions and Order

For the reasons explained above in § III, Defendants' Motion for Summary Judgment (Docket Entry No. 27) is **GRANTED**.

**SIGNED** at Houston, Texas, on this the 3rd day of June, 2016.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

-40-